Good morning, Your Honors. May it please the Court and Counsel, my name is Vincent Mocchio and I represent the appellant Barton Roberts in this 1983 civil rights case regarding the stroke that Mr. Roberts had while an inmate at the St. Cloud, Minnesota prison. There are two issues for this court with regard to the District Court's grant of summary judgment in favor of defendants and against my client Barton Roberts. The first is are there questions of fact for a jury about whether Mr. Roberts was exhibiting signs of a serious medical condition on Monday, September 28th? Monday, September 28th is the important day because that's the day that the defendants in this case, COs Gondek, Kopinski, and Kopel came on duty. Mr. Roberts had the stroke on Friday evening and over the weekend exhibited signs of numbness, vertigo, inability to get out of bed, excessive vomiting, not eating. All of that happened over the weekend and he interacted with several COs during that time asking for medical help but because of his condition, having just had a stroke and being numb and having vertigo, he can't remember any of the COs that he interacted with and through discovery and getting pictures and everything we were unable to establish. He was unable to say with certainty, yeah that's the person I dealt with, that's the person I dealt with. So we can't... Quick question. You mentioned numbness. I don't recall that being in the in the facts that were reported to any of the COs. Yes, Your Honor. Numbness was, there are instances of numbness. He, with regard to the defendants here, he specifically told Mr. Gondek that he felt like he was having a heart attack. Now he didn't testify that he told him about the numbness at that time but when deposed and asked why he felt like he was having a heart attack, he talked about numbness. But he didn't say that to Gondek. He didn't say that to Gondek. Did he say that to anybody? He said that to COs over the weekend who are not... They're not part of this. Who are not defendants here. Exactly. And that's why it's not cited in the brief. With regard to Gondek... That could be kind of an obvious stroke symptom. That would be an obvious stroke symptom as well as the extreme vertigo that Gondek did witness. The inability to stand up, which Gondek did witness. Mr. Roberts testified that Gondek came to the cell to do what's called a stand-up count. Mr. Roberts was unable to get out of what he described as a puddle of vomit on the floor. Gondek saw him in this puddle of vomit, unable to get up and said, that's okay, you can stand up the no medical attention. Gondek told... Roberts told Gondek he felt like he was having a heart attack, he needed medical attention. The only thing that he was told by Gondek was drink some water and that I will report it to medical staff. There is no record and defendants have been able to produce no record whatsoever that there was ever any such report made to medical staff by any CO. He did subsequently see a nurse and a doctor who didn't diagnose this, right? And that is the second issue for the court, which is whether... Mind if I jump ahead then? Because aren't there a couple of cases that say if medical professionals aren't able to recognize it as a serious medical condition, how can one expect lay people to do so? There are cases that say that. They're cited in the brief. There's actually four cases that have been cited by the parties. Carpenter, Christian, Scott v. Carpenter, which is a different Carpenter case, and all of those cases, we contend, are situations where the diagnosis is made either at the time or prior to the time that the COs, the jail staff, fail to get medical attention. In this case, the diagnosis is after the fact and the timing is critical and I say we contend because with regard to the Christian case, as argued in our briefs, the facts are very muddled in the opinion and there's some dispute as to whether or not, what the exact timing was, but the timing here is critical because what you are then saying is if at any time later on a medical professional can't find evidence of a stroke or some illness that happened several days before, then the intervening time when the COs got him no help is excused as a matter of law. It's not several days. It's Monday v. Tuesday. It's Monday v. Tuesday with regard to the... It's Monday morning, I believe. It's Monday v. Tuesday. Well, you could say it's Monday morning v. Tuesday morning, but I will say a day. So where's the evidence that that delay might be material to the diagnosis? Because the evidence in the record is that his improvement was happening on a very quick basis from day to day. The evidence in the record is that as of Monday, the vomiting was subsiding. He's testified, and it's in the brief, that his vertigo was getting better. If he's improving that fast, how do we infer that anyone would have caught it Monday, any medical professional? Well, that's the question for the jury, and that is our sole contention with regard to that first issue, which is that it is for the jury to determine whether or not on Monday v. Tuesday, given his improvement, if he had gotten help on Monday, he might have gotten some relief for his stroke symptoms. And if he had gotten relief for his stroke symptoms, then his second stroke, which he had later that week on Friday, would have been prevented. That is the case in a nutshell. And I understand that it's only 24 hours, but the fact of the matter is that it is 24 hours and 24 hours of improvement. And we are saying, the district court is saying that as a matter of law, and a jury doesn't have to be consulted, we can assume that what he exhibited on Tuesday is the same as what he exhibited on Monday, and that because on Tuesday, a nurse in a different facility, Washington County, didn't catch that he was having a stroke, that means that he had been sent to a doctor, perhaps, on Monday, not a nurse, but a doctor, that that doctor would not have recognized that he had a stroke and he needed immediate attention. That's the assumption here that has been, it's a finding of fact that has been made by the district court. That is the basis of the appeal with regard to that issue, that you cannot make that assumption, that it's an improper finding of fact to make that the evidence to be presented to the jury is that even though it was only 24 hours, there was improvement, and that if he had been presented to a doctor exhibiting the symptoms rather than a nurse taking notes on what he says his symptoms were, there may very well have been a different outcome. What about what seems like was kind of a misdiagnosis, so to speak, of his name appearing on the dental call list and a subsequent examination suggesting that his symptoms were because of an abscessed tooth that needed to be pulled as opposed to a stroke? If you've got medical professionals debating about the origin of these dental issues, how does that affect the responsibility of jail personnel? A couple of things on that, Your Honor. First of all, just to make sure that the facts are straight, on Monday morning he asked another inmate, because he couldn't get out of bed and make it down the steps to do it himself, he asked another inmate who is simply identified as New York to go down and sign him up for medical, a medical visit. New York, for some reason, signed him up for a dental visit. Regardless, he got no medical attention, and Gondek himself testified in the record, and it's cited in the brief, that when you sign up for a medical visit, you're supposed to get a medical visit that day. You're supposed to see a doctor. Despite the fact that New York signed him up for a dental rather than a medical visit, he got no attention. That's the first thing. The second thing is when he comes back from Washington County on Thursday, the intake nurse sees him and says, something's wrong here. You've got to go to the doctor. They send him to the doctor in the jail who says, I think you have an abscessed tooth, but now we're not 24 hours, we're 72 hours after Monday, and we're 144 hours after Friday when he had the stroke. That doctor sends him to the dentist. The dentist actually says, I don't think this guy's symptoms are caused by an abscessed tooth, but the doctor insists that he pull the tooth. So now you do have several days to when that doctor misdiagnoses his symptoms as an abscessed tooth, although the dentist disagrees. But that's not to be confused with the fact that on Monday, he wants to sign up for a medical visit. The person who he asks to do it makes an error, but nonetheless, he sees nobody. The jail doesn't act on it in any way, shape, or form, send them to either a dentist or a doctor. How are jail personnel responsible for his ineffective agent in signing him up for a medical visit? The jail personnel are not responsible for that. However, the fact that he was put on a dental request means he should have seen a dentist on Monday, and he didn't, and everybody admits. That's not a 1983 case. I'm sorry, I don't understand why. A delay, you know, because it's the practice or policy of that facility that the day we get a request, you see a medical professional. A violation of that is not a 1983 violation. Well, if you are suffering from a serious medical condition, and our case is that he was suffering from a serious medical condition, and that the If he had seen a dentist on Monday, this wouldn't have happened? We don't know. That's another question for the jury. That's not even the claim. But whether or not that's a claim, I'm just providing the facts here with regard to Judge Schmidt's question. But you're suggesting a violation of that practice or policy. It makes your case, and it doesn't. I'm not suggesting it makes the case. I'm saying that it isn't, not to argue with you, Your Honor. I don't mean to do that. But I'm not saying that that makes the case. And in our brief, we don't argue that that violation is the case. We argue that what the COs observed on Monday creates questions of fact as to whether or not he was suffering from a serious medical condition, and that he should get a jury on those issues. With regard to the whole not going to see a doctor thing, I think it's just one more piece of evidence, which can be presented to the jury, that nobody in the jail, including the COs, were taking him seriously. In fact, Sergeant Copel berated him for having not gone down and signing the medical form himself, and berated him for not being able to get out of bed to go down and get a TV remote that he had ordered several weeks earlier. Can we talk about the causation expert, Dr. Lipson? Where did the district court go wrong in suggesting that his opinion was that he had to have treatment within hours before it could have prevented this second stroke? Yes, Your Honor. With regard to causation, there's two concepts there in the expert affidavit. And what the expert does say, and this is cited on page 29 of the brief, is that Mr. Thompson, Mr. Roberts, remained at high risk for further strokes until he could get treatment. And there's two concepts. And the first is that after you have a stroke, you have to get treatment within several hours  But the second concept is that once you've had a stroke, at some point you need to get some treatment to prevent a second stroke, and that you remain at high risk of a second stroke, and that's exactly what happened in this case. He did not receive that treatment. When he did see a nurse, they didn't recognize the symptoms, although it's our position that they had passed by then, and he did, in fact, have a second stroke. Does the expert ever say in a more clear way that had he had treatment as late as Monday when these defendants came in, that the second stroke was preventable? What he says is that he remained at high risk and that treatment would have . . . Isn't that a difference? Isn't there a difference? Well, let's get the exact . . . Because he talks at some length about how getting treatment in the first few hours can reverse the damage from the first one. But I find it less than clear that he's saying if he got treatment on Monday, it would reduce or eliminate the risk of the second stroke. He says he remained at high risk for further strokes until treatment was finally provided on October 1, 2015, many days after his initial stroke, and only after his arterial dissection had caused the second stroke, further damaging his neurologic function. So he says he remained at risk of further strokes until October 1, which was Thursday, which means on Monday, three days earlier, he was at high risk of further strokes, which would have been mitigated by treatment. Well, okay. It's the which which would have been mitigated by treatment that I find hard to decipher out of that. Well, I think it's . . . There's no reason to say . . . Well, let's see. Provided on October 1, many days after his initial stroke and only after his arterial dissection had caused the second stroke, further damaging his neurologic function. I mean, I think it's obvious that you have a better chance of preventing that second stroke if you get treatment in that period of time, and he didn't get the treatment before he had the second stroke. Okay. My time is up. Thank you. Thanks. Thank you, Mr. Mocio. Mr. Marisam? Good morning. May it please the Court? My name is Jason Marisam, and I represent the correctional officers in this case. I want to start right away by correcting a major misstatement of what the record says with respect to this medical call issue on that Monday. And this is in the appendix at A32. It is the appellant's own testimony. He did tell New York to report to the correctional officers that he could not make work. He was asked, this is on page 18 of his deposition, did you ask him to sign you up for sick call? Answer, no. I told him to inform, you know, whoever at the desk or to whatever. Question. And you told him, when you say inform or do whatever, you mean inform the correctional officers that you could not go to your job to work? Right. Yeah. So he was asked, did you tell him to sign you up for medical sick call? No. He testified that he understood that signing up for medical sick call was the way to see a doctor. So medical sick call sheets aren't out on the weekend at the facility. They're only put out on weekdays. So Monday morning was his first time to sign up to see a doctor. He had the opportunity to do it. He testified that he knows that's how you go see a doctor. He did not. He said, tell him I can't make it to work. Very different than saying I need to see a doctor. I also want to point out some language about this being so obviously severe. On page A45, again, his deposition, page 189, this is how he described his symptoms. And I don't know exactly what was going on. I don't know if it's like a flu bug or whatever, you know. But I did tell him something was going on that sort of Friday night. Now, later in the deposition he does say he thought he had a heart attack. But this record is rife with references to flu. Generally speaking, do people who experience the flu lay in a puddle of their own vomit? I don't know, Your Honor. Doesn't it seem a little more serious than just the flu? It may have been, however. His own deposition testimony was that the doctor told him he thought it was the flu. The nurse's note, when he saw the nurse at Washington County, the nurse's note says, the patient is concerned he has the flu. And asked about that at deposition, asked do you recall telling the nurse that you had the flu? He didn't deny it. He said, I recall telling the nurse all of my symptoms. Which, of course, goes to his point that the nurse and doctor didn't know the symptoms. He testified he told them all the symptoms. So it may have been more severe, perhaps, looking at this. But we've got to look at it. The standard for the correctional officers is that it needs to be so obvious that even a lay person would recognize the necessity for a doctor's attention. And the mental state needs to be akin to criminal recklessness. On his best day, we are nowhere near that standard. We have a nurse and a doctor with references to the flu. So even if the fact is saying it was worse, we have getting to that standard. We just don't have assuming this facts. Well, isn't what's relevant is what the officers were able to observe and what was reported to them by the plaintiff? That's correct, Your Honor. I also want to point out his testimony that he was starting to feel better on Monday when they got there. This is A31, page 13 of his deposition. The vomiting, you know, subsided by, you know, probably the Monday. You know, I quit throwing up, but I had thrown up for two days. And that's supported by what he, in the doctor's note, when the doctor reviewed him, he said the same thing. I was starting to feel better, and he doesn't dispute any of that. So we have, I think, several facts here that are important. So first, they're not on duty for the whole weekend. They don't get to him until Monday when his own testimony is he's starting to improve. Second, he has the opportunity to sign up to see a doctor that Monday morning. He testified he knows how a sick call works. He doesn't do it, doesn't ask anyone to do it, contrary to what Mr. Moccia was saying. Later, he's then examined by the nurse and the doctor, who found nothing serious. Can we talk about that for just a second? You heard my discussion with Mr. Moccia on the four cases. Yes. That sort of exonerate your clients where a nurse or a professional is unable to diagnose. What about his argument, though, that this has occurred after  Do you think that distinguishes those cases? I do not, Your Honor, and I'll make two points on that point. The principle in those cases is not that correctional officers are relying on a prior diagnosis. That's a whole separate line of cases. The principle is that if trained health care professionals are aware of these symptoms and don't detect anything serious, then you can't find the lay correctional officers deliberately indifferent. It is undisputed, and we cite it all here, that he told the doctor and the nurse his full symptoms. There's the doctor's note from the examination that was read. So your point is that what was relied on was not just his condition when he was interviewed by the doctors, but it was his report of his prior symptoms. Absolutely, Your Honor, and the doctor made the diagnosis. So this is A30, page 10 and 11 of the deposition. It's a question about the note, the doctor's note, where the doctor's note clearly lays out all of his symptoms. It says, you know, the patient presents with dizziness. He was out on a lawyer visit or something and developed over the weekend some nausea and vomiting and extreme dizziness. He kind of felt that if he stayed in bed, he would be fine. So he kind of segregated himself, and the nausea and vomiting actually let up after the weekend. Maybe it persisted a little bit into Monday, but he slowly improved and got better. That's what the doctor's note said. He was asked about that. He disputed that he was feeling better, disputed that he was segregated, so he didn't know where that came from, but said, but all those symptoms, that accurately described how you were feeling. His answer, well, yes, the vomiting, extreme dizziness, vertigo, that describes it. So he conceded the doctor was aware of all of the symptoms from that going all the way back to the weekend. He said the same thing about the nurse, too, and it's in the record. He told the nurse all of his symptoms. Was there ever any report to anyone about numbness? The numbness comes up on Thursday, October 1st. He comes back from Washington County. He goes in there. He goes and sees the nurse. He reports at the intake screening, reports vertigo, goes and sees the doctor. The doctor examines him, sees nothing serious, says it might be your tooth. He agrees to have the tooth extracted, sees his tooth extracted. Sometime at around 5 p.m. that day, he collapses in his numbness. Immediately, Gondek sends an emergency, and he's immediately taken to the hospital, where he's diagnosed with one stroke at that time. His expert comes in and says he thinks what happened Friday night was also a stroke,  but nobody knew that that was a stroke. It may have been. He has evidence from the expert saying it was, but no one at the time was saying. Can we talk about the causation expert for a minute? Yes. Isn't it a fair reading of what the causation expert is saying, that had there been treatment within a few hours of the first stroke, that could have been reversed, but that even after that, he remained highly susceptible, and treatment still would have at least had some ability to prevent the second stroke? Isn't that a more fair reading of his opinion? It would be, but for the last sentence. If you read the next sentence, which is A73, his report, he says, yes, he was at high stroke. And as you pointed out, Your Honor, there's some ambiguity of what he meant. It's clarified by the conclusion. Therefore, the lateral medullary stroke would very likely have been prevented, meaning the second stroke very likely would have been prevented, with appropriate and timely medical care, if provided at the onset of his initial stroke on September 26, 2015. So it's ambiguity about when the second stroke could have been prevented. The specific conclusion says, if provided at the onset. It's his burden to put in verifying medical evidence that, if the COs had taken him to the doctor Monday, it would have been prevented. When you get to Question 3, which was more explicit to whether it's preventable, it says, it further deteriorated with a second, perhaps likely preventable stroke occurred affecting which also. It's just less than clear to me whether he's saying the treatment had to be within hours or any time before the second one would have helped. That's a fair point, Your Honor, and that cuts against him. It's his burden to put verifying medical evidence that shows, if he'd gotten to the doctor on Monday, if they'd taken him there, it would have been prevented. And I don't read that as showing that he's met that burden. I don't think it's quite as clear as the district court said either, though. Fair enough. Thank you. What other points? I think, taken together, Your Honor, he needs to show an objectively serious medical condition that was so obvious the layperson could easily recognize it, and a mental state akin to recklessness. Oh, here's my second point. There is no argument or no evidence that either the nurse or the doctor were negligent, let alone grossly negligent, in their examinations. His only argument is that the fact that it was a day later or three days later means it doesn't matter. So what he's trying to say is these correctional officers should have detected it when a nurse and doctor, apprised of all the symptoms that he'd suffered throughout the weekend, didn't detect anything serious. And there's no evidence in the record and no argument that they were faulty at all. How can we hold the correctional officers to a standard where they should have detected this when the perfectly professional examination is by the nurse and doctor did not detect it? So taken together, Your Honor, we've got the symptoms beginning two or three days before the correctional officers are there, some of it subsiding by the time they get there. You have an opportunity to sign up to see the doctor on Monday morning. He testified he knows that's how you get to see the doctor. Didn't sign up or ask anyone to sign him up to see the doctor. He's then examined by a nurse, examined by a doctor. They don't see anything serious. The record's replete with references to the flu, the doctors talking to him about the flu.  All those facts together, we don't get close to deliberate indifference by lay correctional officers here showing something akin to criminal recklessness. And then on the last point, the causation argument, which I believe we've discussed. I have nothing further. Thank you, Your Honors. Thank you, Mr. Marison. Mr. Mocio, I think we used up all your time. We were badgering you pretty good, but we'll give you a minute to reply to something you've heard here. Thank you, Your Honor. First of all, I would like to apologize for the court. I did misquote with regard to the Monday. Mr. Roberts did testify that he wanted New York to inform the COs that he was not going to work, and New York did, in fact, sign him up for a dental visit, which he never had. I want to remind the court that we're asking for reversal of a summary judgment. These facts have to be taken in the light most favorable to Mr. Roberts. That includes the fact that symptoms being presented and a doctor seeing the person who is suffering those symptoms is different from somebody who's a non-medical professional, Mr. Roberts, who thinks he might have the flu, later relating those symptoms to a medical professional. And to equate those two, I believe, is, in effect, taking those facts in the light most favorable to the defendant. Second of all, also with causation. Can I ask you about it? I think you're addressing the four cases where exonerated by the medical professional situation. And I think your argument was, look, they're seeing him a day later when he may have recovered somewhat. I think the counterargument was, no, they're relying on your client's report of the symptoms that occurred to him at the time, probably in addition to how he appeared at the time. So in light of that argument, do you still think it distinguishes the four cases? Yes, I do, because I think the distinguishing factor is presenting with symptoms and having a medical professional look at you and say, that doesn't look right, this doesn't look right, as opposed to you telling them, yes, I had some vomiting over the weekend. But I'll bet you had he said to them, and I had numbness on the left side of my face, I'll bet you there would have been a different outcome from the medical professionals. And all we can guess at is whether or not that question or that inquiry and answer would have been given on Monday, and we don't know the answer to that, and that's what we need a jury to decide, rather than making the assumption that, no, it wouldn't have happened. On Monday it would have happened just like it happened on Tuesday. That's the assumption that is being made here, which makes this summary judgment an error. And quickly, with regards to causation, while Mr. Morrison is correct that in opposing summary judgment we have the burden of putting in the affidavits, and we put the affidavit in, I think that that evidence as well has to be taken in the light most favorable to the plaintiff, the appellant here. And by taking it too far, as Mr. Morrison even conceded the district court did,  Thank you. Thank you, Mr. Moscio. Court, thanks both counsel for your presence and the arguments you provided to the court. It has been helpful. We will take the case under advisement and render a decision in due course. Thank you both. You may be excused.